1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   RAM NEHARA,                        )   Case No.: 1:10-cv-00491 - JLT
                                        )
12               Plaintiff,             )   ORDER GRANTING IN PART AND
                                        )   DENYING IN PART DEFENDANT'S MOTION
13         v.                           )   FOR SUMMARY JUDGMENT
                                        )
14   STATE OF CALIFORNIA, et al.,       )
                                        )   (Doc. 116)
15               Defendants.            )
                                        )
16   _____)

17         The California Department of Corrections and Rehabilitation ("Defendant" or "CDCR") seeks

18   summary judgment, or in the alternative summary adjudication, in this action for violations of Title

19   VII.  (Doc. 116).  On January 11, 2013, Plaintiff Ram Nehara ("Plaintiff") filed his opposition to the

20   motion (Doc. 118), to which Defendant filed a reply on January 18, 2013.  (Doc. 123).  For the

21   following reasons, Defendant's motion for summary judgment is **GRANTED IN PART**.

22                        **PROCEDURAL HISTORY**

23         Plaintiff initiated this action by filing his complaint on March 17, 2010. (Doc. 1).  Plaintiff, a

24   former nurse at North Kern State Prison ("NKSP"), alleged that his former employers retaliated

25   against him for complaining about discriminatory overtime and shift assignments.  Plaintiff alleged he

26   was forced to manipulate an incident report and subjected to an internal affairs investigation and

27   disciplinary hearing.  Therefore, Plaintiff alleged the defendants were liable for retaliation, intentional

28   infliction of emotional distress, disability discrimination, and defamation.

                                        1

Plaintiff's complaint was dismissed with leave to amend on July 16, 2010 (Doc. 26), and he filed a First Amended Complaint on August 2, 2010.  (Doc. 43).  Following motions to dismiss filed by the defendants, the Court dismissed Plaintiff's First Amended Complaint for failure to state a claim against NKSP on November 5, 2010.  (Docs. 54, 56).  Plaintiff filed a Second Amended Complaint on November 18, 2010.  (Doc. 67).  Again, the defendants filed a motion to dismiss (Docs. 58-59). The Court determined Plaintiff failed to exhaust his administrative remedies and dismissed the state law tort claims against NKSP and individual defendants with prejudice on August 2, 2011.  (Doc. 71).

On August 8, 2011, Plaintiff filed his Third Amended Complaint ("TAC") against NKSP, the CDCR, and the State of California alleging liability for (1) discrimination and (2) retaliation under Title VII.  (Doc. 75).  The defendants filed their answer on August 23, 2011.  (Doc. 77).

The CDCR filed the motion for summary judgment now before the Court on December 21, 2012, with a statement of undisputed facts attached in support.  (Doc. 116).  On January 11, 2013, Plaintiff filed a statement of disputed facts with his opposition to the motion.  (Docs. 118-21).  On January 18, 2013, the Court found the parties failed to comply with the Court's scheduling order and Local Rule 260, and ordered the parties to meet and confer, and file a joint statement of undisputed facts.  (Doc. 124).

On January 23, 2013, the CDCR filed a document entitled "Joint Statement of Undisputed Facts in Support of Defendant's Motion to Summary Judgment and/or Summary Adjudication."  (Doc. 125).  Thereafter, Plaintiff filed a separate statement, asserting it was necessary because he "made revisions to Defendant's Joint Statement, which were entirely rejected by Defendant when Defendant filed its own Proposed Joint Statement."  (Doc. 126 at 2, n. 2).  The Court held a telephonic conference with the parties on January 24, 2013, regarding the statements filed.  (Doc. 129).  As explained at the conference, the Court herein evaluates the motion for summary judgment using the facts as provided by Defendant and those additional facts set forth in Plaintiff's statement.

## STANDARDS FOR SUMMARY JUDGMENT

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  The moving party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing

1   party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that

2   "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

3   versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d

4   626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the

5   nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

6          Even if a motion for summary adjudication is unopposed, a court cannot grant summary

7   adjudication solely because no opposition has been filed.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95

8   & n.4 (9th Cir. 1994).  The Court must apply standards consistent with Rule 56 to determine whether

9   the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate

10  as a matter of law.  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion

11  for summary judgment, the Court examines the evidence provided by the parties, including pleadings

12  depositions, answer to interrogatories, and admissions on file.  *See* Fed. R. Civ. P. 56(c).

13  **EVIDENTIARY OBJECTIONS**

14         Rule 602 provides that a witness may not testify unless "the witness has personal knowledge of

15  the matter."  Fed. R. Evid. 602.  A lay witness may testify only as to those opinions or inferences

16  which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of

17  the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical,

18  or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

19         Defendant objects to Plaintiff's declaration, asserting repeatedly that it "lacks foundation,

20  personal knowledge, contains hearsay and improper opinion."  *See* Doc. 125 at 19-33 (citing Fed. R.

21  Evid. 602, 701, 702, 801, 802).   Significantly, Plaintiff's declaration contains forty-one paragraphs in

22  nine pages, and incorporates fifty pages of exhibits. (*See* Doc. 119).  Defendant incorrectly assumes

23  the Court will sift through the declaration and determine which objections Defendants might have

24  intended to apply to which sentence(s).  Defendant has waived its objections, because the general

25  objections are unsupported by legal argument or explanation.  Accordingly, objections to Plaintiff's

26  declaration as a whole are **OVERRULED**.

27         Nevertheless, to the extent that statements offered by Plaintiff are speculative or represent a

28  legal conclusion, the Court, as a matter of course, will not factor that material into the analysis.  *See*

*Burch v. Burch v. Regents of the University of California*, 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).

## **REQUESTS FOR JUDICIAL NOTICE**

In support of the motion for summary judgment, Defendant filed a request for judicial notice in support of its motion for summary judgment. (Doc. 116-3). Likewise, Plaintiff filed a request for judicial notice in support of his opposition. (Doc. 122). The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).

Defendant seeks judicial notice of (1) the Amended Notice of Adverse Action signed by Chief Medical Officer, Dr. Ashref Youssef, (2) an order of Kern County Superior Court dated January 28, 2011, in Case. No. S-1500-CV-271896, and (3) the decision of the State Personnel Board issued on July 8, 2011, in Case Nos. 09-1810 and 10-0659E. (Doc. 122). Judicial notice may be taken of court records, as they are sources whose accuracy cannot reasonably be questioned. *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980). In addition, Plaintiff does not deny the authenticity of the "Notice of Adverse Action." Therefore, Defendants' request for judicial notice is **GRANTED**.

Plaintiff requests judicial notice of (1) the declaration of Dr. JM Wang, (2) the declaration of Lorie DeSantiago, and (3) the Court's scheduling order in this case, issued November 8, 2011. (Doc. 122). Judicial notice may be taken of "undisputed matters of public record, including documents on file in federal or state courts." *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted). However, judicial notice may not be taken of disputed facts *within* these documents. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Accordingly, while the Court may take judicial notice of the *fact* that declarations were previously filed in support of

Plaintiff's motion for a temporary restraining order; it cannot take judicial notice of the facts presented therein.  Therefore, Plaintiff's request for judicial notice is **DENIED**.[1]

## UNDISPUTED MATERIAL FACTS[2]

Plaintiff is a national of India, and was employed by Defendant as a nurse at NKSP beginning March 10, 2006.  (UMF 1, 2).  Plaintiff completed the probationary period for his employment in September 2006, and "received a satisfactory overall rating" of his performance reports.  (UMF 3).

On November 21, 2006, Plaintiff told Veda McMillion and Judy Pierce, two of his supervisors, "he felt his safety was threatened . . . as custody officers would escort inmate-patients to [Treatment and Triage], but would then leave the inmate-patients alone with him during treatment."  (UMF 4). Plaintiff was informed "a different RN had raised the same issue to them" the prior week, and "they were 'working on it.'"  *Id.*

On December 20, 2006, Plaintiff approached his supervisor, Reynaldo Diamaano, who is Filipino, to discuss "his unfair treatment with regards to overtime allotment."  (UMF 5).  Despite the conversation with Diamaano, the issue was never resolved.  *Id.*  However, overtime shifts at NKSP were "assigned based on terms set forth in plaintiff's union contract."  (UMF 40).

An inmate attacked Plaintiff while he worked on December 22, 2006.  (UMF 6).  Officer Escarcega brought an inmate-patient to Plaintiff's station in Treatment and Triage.  (Nehara Decl. ¶ 9). Officer Escarcega left Plaintiff alone with the inmate-patient, who then attacked Plaintiff.  *Id.*, ¶ 10. After Plaintiff screamed for help, Officer Escarcega and another custody officer came in and took the inmate off of Plaintiff.  *Id.*  Plaintiff was treated at Delano Regional Medical Center for his injuries. *Id.*; (*see also* Doc. 125 at 20).  He returned to work on December 23, 2006.  (Austin Decl., Exh. B)

Plaintiff completed an incident report regarding the attack.  (UMF 17).  On December 25, 2006, custody officers Remos and Gibbons ordered Plaintiff to revise his report to omit the names of any officers.  (Nehara Depo. at 116:4-7, 117:3-7).  He complained to the Service Employees

---

[1] Regardless, the documents identified are not relied upon in this order.
[2] As explained above, the Court was required to synthesize the parties' stipulated undisputed material facts, Defendant's "undisputed facts," and Plaintiff's "disputed facts" given the parties' failure to file a joint statement. The Court refers only to facts or portions thereof that are not disputed or to facts which are deemed undisputed based upon Plaintiff's failure to provide evidence that a genuine dispute of fact exists.

International Union and NKSP Warden Lydia Hense about both the attack and receiving an order from custody staff regarding his incident report.  (UMF 18, 53).  On December 26, 2006, Michael Cavenaugh, Director of Nursing at NKSP, told Plaintiff not to write any more reports.  (UMF 23,54).

On December 27, 2006, Maurice Junious and Lieutenant Mark Saggs interviewed Plaintiff regarding the attack and orders of Officers Gibbons and Remos.  (UMF 55).  Plaintiff did not know if the attack and order were motivated by his national origin, or if he ever reported his belief that they were.  (UMF 19).  The same day, Cavenaugh called Plaintiff into his office, and "demanded to know why [Plaintiff] had 'dared' to bring his complaints to the warden."  (UMF 56).

In January 2007, Plaintiff's treatment provider recommended he take medical leave for three weeks because of the inmate attack.  (UMF 21).  Cavenaugh denied the request for medical leave.  (Nehara Decl. ¶ 19).  Later in January, Plaintiff met with Karen Rae, the Regional Director, regarding the attack and orders of the custody officers.  (UMF 58).  Although Cavenaugh was present, he was excluded from the meeting at Plaintiff's request.  *Id.*

On March 29, 2007, Cavenaugh "informed plaintiff that he was restricted from patient care due to a pending investigation of reports that he failed to perform required 30 minute checks on inmate/patients who had been placed on suicide watch and falsified the inmate/patient medical records."  (UMF 23). Plaintiff "denied the allegations that he had slept during his shift" at a meeting with Cavenaugh; Warden Hense; and Jeff Kirby, the labor relations representative.  (UMF 9).  This was the last day Plaintiff saw or spoke to Cavenaugh.  (UMF 24).

On March 30, 2007, Cavenaugh recommended the initiation of adverse action against Plaintiff. (UMF 70; Hnatiuk Decl., Exh. F). In addition, Cavenaugh filed a complaint with the Board of Registered Nursing regarding Plaintiff on April 4, 2007.  (UMF 70; Hnatiuk Decl., Exh. E).  In each document, Cavenaugh reported he had been informed Plaintiff was observed sleeping during a shift that spanned from 10 p.m. on March 18, 2007 to 6:00 a.m. on March 19, 2007, and had falsified patient records to indicate he conducted checks every thirty minutes.  (Hnatiuk Decl., Exhs. E, F).

Plaintiff was on leave beginning April 1, 2007.  (UMF 25).  While on leave, he was advised that Internal Affairs conducted an investigation of allegations that he was dishonest and insubordinate during a preliminary hearing, and concluded the allegations were unfounded.  (UMF 27).  Plaintiff

does not know who made the decision to initiate the investigation, or whether the decision-maker was aware of any prior complaints Plaintiff made.  (UMF 28).  Plaintiff returned to work on November 30, 2008, and assigned to handle "full patient care."  (UMF 29, 72).

In January 2009, Plaintiff was assigned to work in "Receiving and Release."  (UMF11).  The bidding process for the position occurred while Plaintiff was on leave, and he did not bid to work in "Receiving and Release."  (UMF 29).

In April 2009, Plaintiff was served with a "Notice of Adverse Action," signed by Chief Medical Officer Dr. Ashref Youssef, which set forth reasons for Plaintiff's termination from NKSP.  (UMF 30; Doc. 116-3, Exh. 1).  Plaintiff never met Dr. Youssef, and does not know whether Dr. Youssef was aware of any complaints Plaintiff made prior to his termination.  (UMF 31-32).  Further, Plaintiff does not know if Dr. Youssef was aware of Plaintiff's national origin.  (UMF 32).  Plaintiff's termination was effective April 30, 2009.  (UMF 12).

The California Department of Consumer Affairs filed an accusation against Plaintiff with the Board of Registered Nursing on June 5, 2009.  (UMF 33).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 28, 2009.  (UMF 13).  In the charge, Plaintiff alleged he "was subjected to the different terms and conditions of employment" by Reynaldo Diamaano, his supervisor who is Filipino.  (UMF 34; Doc. 75, Exh. A). In addition, Plaintiff reported his termination was attributed to "poor performance, dishonesty, and insubordination," but lacked reasons "for the different terms and conditions of employment."  (Doc. 75, Exh. A). Plaintiff asserted he was "retaliated against for complaining and discriminated because of [his] national origin, Indian, race, Asian, and disability, which is a violation of Title VII . . ."  *Id.*

Plaintiff amended the EEOC charge on January 20, 2010.  (UMF 14).  In the amended charge, he clarified his belief that retaliation was for his complaints "about being forced by custody staff, [] supervisors, and colleagues to sign a false incident report and later on officially complaining to management about this."  (UMF 35; Doc. 75, Ex. B).  The EEOC issued a right to sue letter on June 24, 2010.  (UMF 15).

8

1       The California Board of Registered Nursing issued a decision revoking Plaintiff's nursing

2   license on August 4, 2010.  (UMF 16).

3   **DISCUSSION AND ANALYSIS**

4   **I.      Exhaustion of Administrative Remedies**

5       As an initial matter, Defendant contends the Court lacks jurisdiction because Plaintiff failed to

6   exhaust his administrative remedies as to several of the alleged incidents prior to filing suit.  (Doc.

7   116-1 at 10).  A plaintiff must have exhausted his administrative remedies for the Court to have

8   subject matter jurisdiction over the Title VII claims.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091,

9   1099 (9th Cir. 2002).  The Ninth Circuit explained, "Under Title VII, a plaintiff must exhaust [his]

10  administrative remedies by filing a timely charge with the EEOC . . . thereby affording the agency an

11  opportunity to investigate the charge."  *Id.* (citing 42 U.S.C. § 2000e-5(b)).

12      A plaintiff must file an EEOC complaint within 300 days of the alleged violation. See 42

13  U.S.C. § 2000e-5(e); 29 C.F.R. § 1601.13; *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th

14  Cir. 1998).  This requirement serves as a statute of limitations for the filing of Title VII claims. *See*

15  *Draper*, 147 F.3d at 1107.  After receiving a right to sue letter from the EEOC, a plaintiff has 90 days

16  to file a complaint in federal court. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408(c).

17      **A.    Incidents not specified in EEOC charges**

18      Defendant contends that Plaintiff's EEOC charges are limited to the following allegations: "(1)

19  Reynaldo Diamaano subjected him to 'different terms and conditions of employment' [,] (2) Dr.

20  Ashref Youssef terminated him because of his national origin and in retaliation for complaining about

21  discrimination" and (3) "plaintiff was subject to retaliation when staff forced him to file a false

22  incident report."  (Doc. 116-1 at 11) (citing Doc. 75, Exhs. A-B).  Defendant contends Plaintiff is

23  precluded from pursuing claims on incidents added to his complaint because they were not alleged in

24  the EEOC charges filed by Plaintiff, including:

25      (1) discriminatory shift and overtime assignments; (2) December 22, 2006, inmate
26      attack arranged by Officer Escarrega (sic); (3) denial of medical leave following the
        inmate assault; (4) unwarranted restrictions from direct patient care; (5) racially
27      derogatory remarks by Officer Waymire; (5) meritless internal affairs investigations;
        (6) unfounded write-ups; (7) revocation of his registered nursing license; and (8)
28      termination.

9

1   (Doc. 116-1 at 11) (citing TAC ¶¶ 24-27, 33).

2          The Court has subject matter jurisdiction "over all allegations of discrimination that either 'fell

3   within the scope of the *actual* investigation or an EEOC investigation which *can reasonably be*

4   *expected* to grow out of the charge of discrimination.'" *B.K.B.*, 276 F.3d at 1100 (quoting *EEOC v.*

5   *Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994) (emphasis in original)). To determine the scope of

6   its jurisdiction, the Court must "construe the [EEOC] charge liberally." *Sosa v. Hiraoka*, 920 F.2d

7   1451, 1456 (9th Cir. 1990). Language of EEOC charges should be construed "with utmost liberality

8   since they are made by those unschooled in the technicalities of formal pleading." *B.K.B.*, 276 F.3d at

9   1100 (citation omitted); *see also Love v. Pullman Co.*, 404 U.S. 522, 527(1972) ("technicalities are

10  particularly inappropriate in a statutory scheme [such as Title VII] in which laymen, unassisted by

11  trained lawyers, initiate the process").

12         Significantly, "[w]hen an employee seeks judicial relief for incidents not listed in his original

13  charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or

14  reasonably related to the allegations of the EEOC charge, including new acts occurring during the

15  pendency of the charge before the EEOC." *Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571

16  (9th Cir. 1973). To determine whether additional claims are "like or reasonably related to" allegations

17  in an EEOC charge, the Ninth Circuit has considered factors including "the alleged basis of the

18  discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination

19  named in the charge, and any locations which discrimination is alleged to have occurred." *B.K.B.*, 276

20  F.3d at 1100. Further, a plaintiff's claims are considered "reasonably related to allegations in the

21  charge to the extent that those claims are consistent with the plaintiff's original theory of the case as

22  reflected in the plaintiff's factual allegations and his assessment as to why the employer's conduct is

23  unlawful." *Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002) (internal quotations omitted).

24         In the EEOC charges, Plaintiff complained he was "subjected to . . . different terms and

25  conditions of employment" by Reynaldo Diamaano, a supervisory registered nurse, from March 10,

26  2006 through April 30, 2009. (Doc. 75, Exhs. A, B). Further, Plaintiff asserted he "was retaliated

27  against for complaining," and suffered discrimination because of his national origin and race. *Id.* In

28  the amended charge, Plaintiff clarified his belief that retaliation occurred due to his complaint "about

being forced by custody staff, my supervisors and colleagues to sign a false official incident report and later on officially complaining to management about this." *Id.* at 12.  The incidents Plaintiff added to his complaint occurred within the same time period alleged (throughout the course of his employment at NKSP), involve some of the same perpetrators, take place at the same location, and involve the same basis of discrimination against him due to his race.  Because the EEOC charges must be construed "with utmost liberality," the Court finds the additional incidents are reasonably related and consistent with Plaintiff's original theory of discrimination and retaliation as alleged in the EEOC charges.  Accordingly, Defendant's motion, on this basis, is **DENIED**.

### B.  Incidents more than 300 days prior to the EEOC charge

Defendant argues Plaintiff is precluded from pursuing claims that "took place more than 300 days prior to [his] October 2009 EEOC charge." (Doc. 116-1 at 11).  According to Defendant, the following alleged incidents are time barred: "the December 22, 2006, inmate attack allegedly arranged by Officer Escarcega; January 2007, denial of medical leave; March 2007 restriction from direct patient care; and August 2008, internal affairs investigation." *Id.*  On the other hand, Plaintiff argues these claims are actionable although they fall beyond the time limitation because he "suffered continuing violations by Defendant CDCR of his Title VII rights." (Doc. 118 at 12).

Under the doctrine of continuing violations, evidence of incidents occurring beyond the statutory time limit may be considered. *See Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).  However, the Supreme Court explained "discrete acts" must be distinguished from claims of a hostile work environment when applying the doctrine of continuing violations. *Id.* at 114-21.  Discrete acts, including "termination, failure to promote, denial of transfer, or refusal to hire," are individually actionable, because each is an adverse employment action. *Id.* at 114; *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005).  Consequently, the Court has jurisdiction over claims involving discrete acts only if the acts occurred during the statutory period. *Morgan*, 536 U.S. at 117.  Claims of hostile work environment "involve[] repeated conduct" and are "comprised of a series of separate acts that collectedly constitute one 'unlawful employment practice.'" *Id.* at 115, 117.  With these claims, the Court may consider "the entire period of the hostile environment," as long as an act contributing to the claim occurred within the filing period. *Id.* at 117.

Here, Plaintiff alleges "the environment within NKSP and its Nursing Department permeated with racial tension and discrimination." (TAC, ¶ 11; Doc. 118 at 13). Plaintiff contends that "in response to [his] complaints regarding discrimination, Plaintiff's co-workers and managers at NKSP conspired to leave "a violent or mentally unstable inmate alone, unguarded and restrained with Plaintiff for evaluation in a room at NKSP, knowing it was . . . substantially likely that the inmate would attack." (TAC, ¶ 14). In addition, Plaintiff asserts the inmate attack was motivated by his Indian nationality. *Id.* ¶¶ 16, 25. Because this alleged incident is one of the acts supporting the claim of a hostile work environment, it is actionable under the doctrine of continuing violations.

On the other hand, Plaintiff asserts the denial of medical leave, restriction from patient care, and internal affairs investigation were motivated by retaliation, not racial discrimination. (TAC, ¶ 17) Importantly, these incidents are "the sort of discrete and salient event[s] that should put an employee on notice that a cause of action has accrued." *Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir. 1998). The Supreme Court explained that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. Consequently, denial of medical leave, restriction from patient care, and internal affairs investigation constitute discrete acts. *See, e.g., Porter*, 419 F.3d at 893 (denial of a vacation request is a discrete act); *Walech v. Target Corp.*, 2012 U.S. Dist. LEXIS 44119, at *18 (W.D. Wash. Mar. 28, 2012) ("failure to grant requested medical leave based on [the plaintiff's] disability" was a discrete act); *Mora v. Ashcroft*, 142 Fed. App'x 206 (5th Cir. 2005) ("alleged retaliatory investigation" is a discrete act); *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 500 (S.D.N.Y. 2010) ("job reassignments are discrete acts that cannot form the basis for a continuing violation claim"). Because these discrete acts are not within the scope of the continuing violations doctrine and fall beyond the 300-day period applicable to Plaintiff's initial EEOC charge, they are not actionable. Nevertheless, the acts may be considered when evaluating Plaintiff's claims. *See Morgan*, 536 U.S. at 113.

## II.    Applicability of Workers' Compensation

Defendant argues, "The exclusive remedy provisions of the Workers' Compensation Act bar plaintiff's inmate attack and coercion claims." (Doc. 116-1 at 12). As noted by Defendant, the Workers' Compensation Act "provides the exclusive remedy for employees who sustain injuries

arising from conduct normally occurring in the workplace." *Id.* (citing *Fermino v. Fedco Inc.*, 7 Cal.4th 701, 708 (1994); *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 159-60 (1987)). Consequently, Defendant asserts claims related to the attack by an inmate on December 22, 2006, "are preempted by the Workers' Compensation Act." *Id.* at 13.

On the other hand, Plaintiff contends he "is not seeking to remedy the physical injuries he sustained as a result of the inmate attack in 2006." (Doc. 118. 14).  Significantly, review of Plaintiff's Third Amended Complaint reveals he does not make a claim for injuries related to the attack.  (*See* Doc. 75).  Thus, the Workers' Compensation Act is inapplicable and does not affect the Court's jurisdiction over Plaintiff's claims.

### III.    Plaintiff's Title VII Claims

Plaintiff alleges Defendants are liable for racial discrimination and retaliation in violation of Title VII.  (Doc. 75 at 5-7).  Claims for violations of Title VII involve shifting burdens.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  First, the plaintiff bears the burden to establish a prima facie case of employment discrimination.  *Id.* at 802; *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  The evidence may be either direct or circumstantial, and the amount that must be produced to create a prima facie case is "very little."  *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes his prima facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas Corp*, 411 U.S. at 803.  If the defendant carries this burden, the inquiry does not end.  Rather, the burden shifts back to the plaintiff to demonstrate the reasons proffered by defendant are pretext for the violation of Title VII. *Id.*; *McDonnell Douglas Corp*, 411 U.S. at 805.  Thus, the plaintiff has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him]." *Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133, 142 (2000).

#### A.    Racial Discrimination

As his first cause of action, Plaintiff asserts Defendants are liable for racial discrimination in violation of Title VII, as set forth in 42 U.S.C. § 2000e-2.  (Doc. 75 at 5).  Specifically, Title VII

provides it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Supreme Court determined this guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). A plaintiff may show racial discrimination in violation of Title VII by proving disparate treatment or impact, or by establishing the existence of a hostile work environment. *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991) (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Jordan v. Clark*, 847 F.2d 1368, 1373 (9th Cir. 1988); *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1392 (9th Cir. 1984)). In the Third Amended Complaint, Plaintiff advances two theories of race discrimination: a hostile work environment and disparate treatment. (*See* Doc. 75 at 5-6).

### 1.     Hostile Work Environment

The Supreme Court determined Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). The Supreme Court instructs that a court must consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan,* 536 U.S. at 116 (citation omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted). Further, the requisite level of severity "varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

To prevail on a hostile work environment claim, "a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's

14

employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *see also Dawson v. Entek Int'l*, 630 F.3d 928, 939 (9th Cir. 2011).  A plaintiff must demonstrate "the conduct at issue was both objectively and subjectively offensive: he must show that a reasonable person would find the work environment to be 'hostile or abusive,' and that he in fact did perceive it to be so." *Dawson*, 630 F.3d at 938 (quoting *Faragher*, 524 U.S. at 787).

Here, Plaintiff asserts that "the environment within NKSP and its Nursing Department permeated with racial tension and discrimination." (TAC ¶¶ 11, 25).  However, evidence presented undermines his claim.  For example, Plaintiff testified he did not know if Officer Escarcega knew Plaintiff was of Indian descent, and did not recall if Officer Escarcega made any derogatory or negative comments about Indian people.  (Nehara Depo. at 107:22- 108:3).  Also, Plaintiff testified he did not know if custody officers ordered him to revise the incident report because of his race:

> A.   Ramos told [me] if I don't change the report the way they want they will arrest me and I won't be able to go home.
> Q.   And do you believe he said that because of your race or national origin?
> A.   I don't know. I cannot speculate that one.

(Nehara Depo. at 116:10-15).  Indeed, the only specific conduct identified by Plaintiff regarding his race is that he was called "7-Eleven" by Delores Waymire, a custody officer.  According to Plaintiff, Waymire "would frequently refer to [him] as '7-Eleven,' referring to the stereotype that 7-Elevens are staffed primarily by people of Indian nationality." (Nehara Decl. ¶ 37).  Plaintiff asserts: "On February 18, 2009, I came to my work station to find a note Waymire had left, instructing me not to touch particular boxes or 'No more (7-Eleven) for you!!'" *Id.* He states that he presented the note to his supervisors, but Waymire continued to call Plaintiff "7-Eleven" until his termination. *Id.*

Notably, whether Waymire called Plaintiff "7-Eleven" is disputed. Waymire testified she never addressed Plaintiff by this name, and that the reference to "7-Eleven" was added to the note by another. (Waymire Depo. at 105:19-106:-15, 110:10-18).  However, assuming as true that Waymire referred to Plaintiff as "7-Eleven," even still Plaintiff has failed to show "the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *See Vasquez*, 349 F.3d at 642.  Although objectively and subjectively offensive, the

15

1    alleged conduct was not physically threatening, and Plaintiff does not present evidence that it

2    interfered with his work performance. *See Morgan,* 536 U.S. at 116; *Dawson,* 630 F.3d at 938.

3          In *Vasquez,* the Ninth Circuit noted the plaintiff complained about harassing racially-related

4    epithets and conduct "which occurred over the course of more than one year." *Vasquez,* 349 F.3d at

5    644.  The Court determined the offensive remarks were not severe or pervasive enough to create a

6    hostile work environment. *Id.*  Further, in *Sanchez v. City of Santa Ana,* the Ninth Circuit upheld a

7    district court's decision that no hostile work environment existed where "the employer posted a

8    racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules,

9    provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and

10   kept illegal personnel files on plaintiffs because they were Latino." *Vasquez,* 349 F.3d at 643 (citing

11   *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1031, 1036 (9th Cir. 1990)).

12         Although Plaintiff asserts he was "frequently" called "7-Eleven" by Waymire while working in

13   Receiving and Release from November 30, 2008 through April 30, 2009, he only identifies one

14   specific instance.[3]  Similarly, in *Vasquez,* the Ninth Circuit noted the plaintiff asserted the defendant

15   "continually harassed him but provide[d] specific factual allegations regarding only a few incidents."

16   *Vasquez,* 349 F.3d at 642.  Moreover, the facts now before the Court are much less egregious than

17   *Sanchez* in which the Court found the plaintiff did not establish a hostile work environment.  Because

18   Plaintiff has failed to demonstrate the actions were sufficiently severe and to alter the conditions of

19   employment, he is unable to state a prima facie case for a hostile work environment.  Consequently,

20   summary adjudication of this claim is **GRANTED**.

21              2.      Disparate Treatment

22         "A person suffers disparate treatment in his employment when he or she is singled out and

23

---

24         [3] In addition, in Exhibit H to Plaintiff's declaration, there is a statement that two Fillipino coworkers "daily"
25   asked Plaintiff to switch shifts and he refused every day. (Doc. 119-1 at19)  In response, these coworkers both said, "you
     are working with Fillipino & we are telling you." Id.  Notably, this documents is not sworn and Plaintiff's declaration fails
     to assert, under penalty of perjury, that it is accurate. (Doc. 119 at 6.)  Though he asserts that the document is a "true and
26   correct copy of that document I submitted to the Director of Nurses on March 14, 2007," he does not swear that what he set
     forth therein was accurate, under penalty of perjury.  Moreover, the document on this point is vague.  He seems to say that
27   every single day of his employment both of these two coworkers asked to switch shifts with him, every day he refused and
     every day the coworkers reminded him of their national origin.  This seems most quite unlikely and it is more likely to be
28   an exaggeration.  Notably, his declaration fails to even discuss this claim so it fails to provide any clarification. (Doc. 119
     at 6.)  Thus, this evidence fails under *Vasquez* to demonstrate a prima facie case of a hostile work environment.

treated less favorably than others similarly situated on account of race." *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). To prevail on a claim of disparate treatment, a plaintiff must first establish a prima facie case that gives rise to an inference of unlawful discrimination. Specifically, a plaintiff establishes a prima facie case of disparate treatment if he shows that (1) he belongs to a class protected by Title VII; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) "the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell,* 493 F.3d at 1028 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

Here, it is undisputed that Plaintiff belongs to a protected class. (UMF 1; Doc. 116-1 at 14). In addition, Defendant does not dispute Plaintiff suffered an adverse employment action when he was terminated from NKSP. (Doc. 116-1 at 14). Further, Plaintiff "received a satisfactory overall rating" on his performance reports during his probationary period. (UMF 3). To establish a prima facie claim for disparate treatment, Plaintiff must demonstrate he was treated differently than similarly situated individuals. *Cornwell,* 493 F.3d at 1028; *Peterson v. Hewlett- Packard Co.*, 358 F.3d 599, 603 (2004).

Employees "are similarly situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. The employees' roles need not be identical; similarly situated means "similar in all material respects." *Hawn*, 615 F.3d at 1157. The Supreme Court explained, "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

Plaintiff asserts he "was treated differently, and unfavorably, than the majority of his fellow registered nurses, all of whom shared a common racial background different from that of [Plaintiff]." (Doc. 118 at 16). According to Plaintiff, "although he was given shift assignments and was allotted overtime, he almost never received the shifts for which he had bid. Rather, Filipino registered nurses were being awarded shifts and posts they had bid for, and would routinely receive shifts or posts that [Plaintiff] had bid for." *Id.* Significantly, however, Plaintiff was unable to name *a single individual* who was treated more favorably. (Nehara Depo. at 63:12- 64:15, 84:3-85:1). There simply is no evidence that individuals with the same or less seniority were treated more favorably that Plaintiff or

17

given shift assignments for which Plaintiff bid.  Indeed, it is undisputed that overtime shifts were

assigned by terms set forth in his union contract.  (UMF 40).

Because there is no evidence that Plaintiff was treated differently than similarly situated

employees who were not of Plaintiff's national origin, Plaintiff is unable to state a prima facie case for

disparate treatment.  Consequently, Defendant's motion for summary adjudication of this claim is

**GRANTED**.

### B.   Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . .

because he has opposed any practice made an unlawful employment practice by this [title] . . . or

because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this [title]. . . ." 42 U.S.C. § 2000e-3(a).  Thus, an "employer can violate

the anti-retaliation provisions of Title VII in either of two ways: (1) if the adverse employment action

occurs because of the employee's opposition to conduct made unlawful [by Title VII]; or (2) if it is in

retaliation for the employee's participation in the machinery set up by Title VII to enforce its

provisions."  *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997).  To establish a claim for

retaliation, a plaintiff must show: (1) he engaged in protected activity; (2) his employer subjected him

to an adverse employment action; and (3) there is a causal link between the protected activity and the

adverse action.  *Bleeker v. Vilsack*, 468 Fed. App'x 731, 732 (9th Cir. 2012); *Ray v. Henderson*, 217

F.3d 1234, 1240 (9th Cir. 2000).

### 1.   Plaintiff's prima facie case

#### a.   *Protected activity*

For an employee's "opposition" to be protected, the employer's conduct which the employee

opposed "must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation."

*Learned v. Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).  Conduct constituting a "protected activity"

under Title VII includes filing a charge or complaint, testifying about an employer's alleged unlawful

practices, and "engaging in other activity intended to oppose an employer's discriminatory practices."

*Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-

3(a)) (internal quotation marks omitted).  The Ninth Circuit determined that "an employee who

1    complains of a practice that has a disproportionate impact on a protected group complains of unlawful

2    discrimination and is protected by the opposition clause." *Gifford v. Atchison, Topeka & Santa Fe Ry.*

3    *Co.*, 685 F.2d 1149, 1157 (9th Cir. 1982). The employee need not "be aware that the practice is

4    unlawful under Title VII at the time of the opposition in order for opposition to be protected." *Id.*

5         In this case, Plaintiff wrote a memorandum to the Director of Nurses on March 14, 2007,

6    regarding his work conditions at NKSP. (Nehara Decl., Exh. H). In the memorandum, Plaintiff

7    complained of discriminatory practices and favoritism toward Filipino nurses. *See id.* Further,

8    Plaintiff addressed: "(a) issues he had with other nurses and custody officers; (b) discrepancies in

9    work log books; (c) threats he was receiving from other nurses; (d) and denial of requests for work-

10   related help, among other things." (Doc. 118 at 18). As Defendant acknowledges, this complaint

11   constitutes an activity protected by Title VII.[4] (*See* Doc. 123 at 8-9). Consequently, Plaintiff has

12   satisfied the requirement that he engaged in a protected activity.

13                         *b.*    *Adverse employment action*

14        "[A]n adverse employment action is one that materially affects the compensation, terms,

15   conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.

16   2008) (internal quotation marks and citation omitted). The Ninth Circuit has determined "a wide array

17   of disadvantageous changes in the workplace constitute adverse employment actions." *Ray*, 217 F.3d

18   at 1240.

19        Here, it is undisputed that Cavenaugh recommended the initiation of an adverse action against

20   Plaintiff, and filed a complaint with the Board of Registered Nursing regarding Plaintiff.[5] (UMF 70;

21   Hnatiuk Decl., Exhs. E-F). Plaintiff asserts the allegations contained therein are false. Accordingly,

22   the actions taken by Cavenaugh may constitute adverse employment actions. *See, e.g., Hashimoto,*

23

24   ───────────────

25        [4] Defendant objects to the admissibility of the memorandum filed by Plaintiff to the Director of Nursing. (Doc.
     123 at 9; Doc. 126 at 26). Defendant asserts the memorandum and Plaintiff's declaration "lack foundation, personal
     knowledge, contain hearsay and improper opinion." (Doc. 126 at 26). For the reasons set forth above, these objections are
26   **OVERRULED**.

27        [5] Defendant focuses on the fact that Plaintiff did not know whether Dr. Yousseff—who actually terminated
     Plaintiff—had any awareness of Plaintiff's prior complaints. However, it seems apparent that Dr. Yousseff based his
28   decision upon the information provided by others whom Plaintiff contends were aware of, and were motivated by, these
     complaints.

118 F.3d at 674 (finding "dissemination of adverse employment references" constitutes an adverse employment action); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("[t]ransfers of job duties and undeserved performance ratings . . . constitute adverse employment decisions").

Further, it is undisputed that Plaintiff was terminated by NKSP, effective April 30, 2009. (UMF 12).  Accordingly, Plaintiff has clearly suffered an adverse employment action.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (termination is an adverse employment action); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (same).

c.    Causal link

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."  *Yartzoff*, 809 F.2d at 1375.  Notably, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."  *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002).

Here, Plaintiff filed his memorandum complaining of discrimination and other work conditions with the Director of Nursing on March 14, 2007.  The same month, Cavenaugh—who served as Director of Nursing at NKSP (UMF 23)—filed a complaint with the Board of Registered Nursing regarding Plaintiff and recommended the initiation of an adverse action against Plaintiff, which eventually lead to his termination.  Given the short period of time between the actions, a causal link may be inferred between Plaintiff's protected activity and the adverse employment action.  *See, e.g., Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (inferring causation where adverse employment actions took place less than three months after the plaintiff's complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint).

2.    Reasons set forth by Defendant

Because Plaintiff has established a prima facie case for retaliation, the burden of production

20

shifts to Defendant "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155.  Defendant asserts Plaintiff's employment was terminated "based on multiple violation[s] of Government Code section 19572 and California Code of Regulation, Title 15." (Doc. 116-1 at 17).  Defendant notes Plaintiff was entitled to appeal his termination to the State Personnel Board, which held an evidentiary proceeding and found Plaintiff had "engaged in inexcusable neglect of duty, dishonesty, willful disobedience, and other failure of good behavior." *Id.*  Accordingly, Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's termination.

### 3.    Plaintiff's burden to show the reasons are pretext

Upon Defendant's showing that the termination was based upon legitimate, business reasons, Plaintiff must "raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext." *Hawn*, 615 F.3d at 1155-56.  A plaintiff must do more than simply deny the credibility of reasons offered by the defendant.  *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence."  *Vasquez*, 349 F.3d at 641; *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  Direct evidence typically consists of retaliatory statements or actions by the employer.  *Coghlan*, 413 F.3d at 1095.  Indirect evidence "requires an additional inferential step" to establish retaliation.  *Id.*

Plaintiff argues Defendant's reasons are pretextual.  (Doc. 118 at 19).  On December 26, 2006, Plaintiff asserts Cavenaugh warned him that he was not to file complaints, and told Plaintiff he would face consequences after his meeting with Karen Rae (Doc. 119 at 4-5[Nehara Decl. ¶¶ 16, 18, 20]).  The next day, Cavenaugh criticized Plaintiff for complaining to the warden and reminded him that he told Plaintiff "not to write any more reports." (Doc. 119 at 5).  In January, when Plaintiff met with Karen Rae again about his complaints related to the inmate attack and insisted that Cavenaugh be excluded, Plaintiff asserts that "Cavenaugh was visibly upset, and told me I would face 'consequences' and that I should ask other employees what he is capable of doing." Id.  After this, Cavenaugh's subordinates, though Plaintiff's superiors, began a campaign of "false write-ups" related to Plaintiff's work activity.  Id.  Finally, Plaintiff asserts Cavenaugh told Plaintiff he was going to

"teach [him] a lesson" on March 29, 2007.  (Doc. 119 at 6 [Nehara Decl. ¶¶ 20, 28]).  Such statements are direct evidence of retaliatory intent.  *See Vasquez*, 349 F.3d at 641; *see also Sischo-Nownejad,* 934 F.2d at 1111 (finding direct evidence of sex discrimination where the plaintiff was called "an old warhorse" and her students "little old ladies"); *Cordova v. State Farm Ins.,* 124 F.3d 1145, 1150 (9th Cir. 1997) (finding direct evidence of race discrimination where employer stated the employee was a "dumb Mexican").  Accordingly, Plaintiff has identified a triable issue of fact as to the motivation Cavenaugh's "recommendation of initiation of adverse action" dated March 30, 2007, which lead to Plaintiff's termination from NKSP.

## **CONCLUSION AND ORDER**

As set forth above, Plaintiff has failed to carry his burden to establish a prima facie case for discrimination in Title VII, either on the theory of a hostile work environment or disparate treatment.  However, the proffered evidence is sufficient to raise genuine issues of fact as to whether Defendant's reasons for the adverse actions were credible, or whether they masked retaliatory motives.  Therefore, Defendant is not entitled to summary adjudication on Plaintiff's claim for retaliation in violation of Title VII.

Based upon the foregoing, it is **HEREBY ORDERED** Defendant's motion for summary judgment is **GRANTED IN PART as follows**:

1.  Summary adjudication of Plaintiff's claim for discrimination in violation of Title VII is **GRANTED**; and

2.  Summary adjudication of Plaintiff's claim for retaliation in violation of Title VII is **DENIED**.


IT IS SO ORDERED.

Dated:   __February 11, 2013__          _____/s/ Jennifer L. Thurston__
UNITED STATES MAGISTRATE JUDGE