UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAM NEHARA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE STATE OF CALIFORNIA, et al.,<br><br>    Defendants. | Case No.: 1:10-cv-00491 JLT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT<br>(Doc. 195)<br><br>ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL AS MOOT<br>(Doc. 188)<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AS MOOT<br>(Doc. 189) |

Before the Court are three motions: Plaintiff's motion for attorneys' fees (Doc. 189), Defendant's motion for new trial (Doc. 188) and Defendant's motion for relief from judgment. (Doc. 195) Because the Court **GRANTS** the motion brought under Fed. R. Civ. P. 60(b) (Doc. 195) it **DENIES** Defendant's earlier motion for new trial (Doc. 188) and Plaintiff's motion for fees (Doc. 189) as **MOOT**.

I.    **Background**

In his complaint, Ram Nehara alleged the California Department of Corrections and Rehabilitation, retaliated against him for actions he took which were protected under Title VII. In April 2013, the Court conducted a seven-day trial after which the jury found for Plaintiff. In keeping

with the Court's obligation, the Court then awarded damages for back pay and front pay consistent with the jury's verdict.

Now before the Court is the motion for relief from judgment in which the CDCR has presented significant evidence Plaintiff perpetrated a scheme to mislead the jury and the Court in order to obtain a favorable verdict and a weighty damage award. As set forth more fully below, the integrity of the judicial process dictates that the judgment not be allowed to stand.

## II.      Legal standards

The CDCR brings this motion under both Rule 59 and Rule 60.

### A.      Rule 59

Federal Rule of Civil Procedure 59 provides in pertinent part: "The court may, on motion, grant a new trial on all of some of the issues–and to any party–as follows: [¶] (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "'Rule 59 does not specify the grounds on which a motion for new trial may be granted.' Rather, the court is 'bound by those grounds that have been historically recognized.'

Historically, recognized grounds include, but are not limited to, claims "'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.' We have held that '[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (internal citations omitted). A motion made under Rule 59 must be made within 28 days of the entry of judgment. Fed. R. Civ. P. 59(b). A Rule 59 motion is "confided to the discretion of the trial court, whose decision will be overturned . . . only for abuse of discretion." Kode v. Carlson, 596 F.3d 608, 611 (9th Cir. 2010) (citing Philippine Nat. Oil Co. v. Garrett Corp., 724 F.3d 803, 805 (9th Cir. 1984)).

The motion was filed on June 25, 2013. (Doc. 195) Entry of judgment occurred on May 3, 2013. (Doc. 184) Though described as a "supplemental" motion, there is no attempt to demonstrate why a "supplemental" motion need not be timely filed. Thus, the motion under Rule 59 is untimely and is **DENIED**.

**B.    Rule 60**

Under Fed. R. Civ. P. 60, the Court may "relieve a party . . . from a final judgment, order, or proceeding for the following reasons:

[¶]

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . ."

The Rule 60 motion must be made within a reasonable time, not to exceed one year from the entry of judgment (Fed. R. Civ. P. 60(c)(1)) and are committed to the sound discretion of the Court.[1] Thompson v. Housing Auth. of Los Angeles, 782 F.2d 829, 832 (9th Cir.1986). Because the motion was filed less than three weeks after the information was discovered (Doc. 195-1 at 6) and was filed less than eight weeks after the entry of judgment, the Court finds it was filed within a reasonable time and is timely.

i.    **Rule 60(b)(2)**

A motion based upon newly discovered evidence, requires the moving party demonstrate the evidence existed at the time of trial, it could not have been discovered with due diligence and was "of such magnitude that production of it earlier would have been likely to change the disposition of the case." Jones v. Aero/Chem Corp., 921 F.2d 875, 878 (9th Cir. 1990) quoting Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., 833 F.2d 208, 211 (9th Cir.1987).

Defendant present numerous pieces of evidence it contends are newly discovered and existed at the time of trial.

a.    **Declaration of Karen Carnes**

First, the CDCR presents the declaration of Karen Carnes. (Doc. 195-3) Mr. Carnes asserts

---

[1] Plaintiff argues that a motion under Fed. R. Civ. P. 60(b) should be granted "only in exceptional circumstances," and he cites Eighth Circuit authority for this proposition. However, Plaintiff fails to cite to any Ninth Circuit authority to support this position and it does not appear this is the standard in this Circuit. Instead, the Court has held the "extraordinary circumstances" test applies only to motions brought under the catch-all provision of Fed. R. Civ. P. 60(b)(6) (Cmty. Dental Servs. v. Tani, 282 F.3d 1164, 1168 (9th Cir. 2002) ("[A] party merits relief under Rule 60(b)(6) if he demonstrates 'extraordinary circumstances which prevented or rendered him unable to prosecute[his case].'")), though it may apply also to the determination whether an attorney's malpractice rises above mere negligence for purpose of 60(b)(1) relief. See Engleson v. Burlington N. R. Co., 972 F.2d 1038, 1044 (9th Cir. 1992).

she was the direct supervisor of Plaintiff at the James Bay Care Center in Victoria, Canada. Id. at 2. Ms. Carnes asserts Plaintiff worked at the Centre from September 6, 2011 through March 14, 2013. Id. In the declaration, Ms. Carnes reports that Plaintiff represented that he was validly registered by the College of Registered Nurses of British Columbia, which was a requirement of the job. (Doc. 195-3 at 2)

Counsel for CDCR attests Ms. Carnes contacted her on June 5, 2013 which was well after completion of the trial and more than a month after the entry of judgment.[2] (Docs. 170, 184) Thus, the court has no hesitation in finding the evidence is newly discovered and existed at the time of trial.

The CDCR contends that this evidence could not have been discovered earlier and points to discovery it conducted to determine whether Plaintiff had any nursing employment after being fired from KVSP and argues it demonstrates a concerted effort by Plaintiff to obfuscate the truth. For his part, Plaintiff argues that the CDCR failed to act diligently in discovering that he, indeed, had worked as a nurse outside this country because the CDCR received documents during discovery of a request by Plaintiff for confirmation of completion of coursework at Indiana State University to be sent to the "College of Nurses of Ontario."[3] (Doc. 205-1 at 10) Also, the Plaintiff notes the CDCR had a document indicating that Plaintiff applied for "endorsement" as a nurse practitioner in the province of Prince Edward Island. (Doc. 205-1 at 11)

In this regard, Plaintiff takes exception to the fact that the CDCR asked specifically about why transcripts were sent to Alberta but did not ask about why they were sent to Ontario or Prince Edward Island. However, as noted below, the CDCR asked appropriately broad questions to address these

---

[2] Plaintiff argues, without *any* supporting evidence, that it is somehow inconceivable that Ms. Austin was contacted by Ms. Carnes when Ms. Austin says she was contacted. (Doc. 205 at 6) Why Ms. Carnes' chose to make this contact in June 2013 is not explained by Ms. Carnes. (Doc. 195-32) However, Plaintiff argues that the timing of the contact must mean that it was in response to an earlier inquiry by Ms. Austin. (Doc. 205 at 6) Why he thinks so, is not explained. In any event, the Court does not give credence to Plaintiff's theory of nefarious action by Ms. Austin. Ms. Austin, an officer of the Court, has represented under penalty of perjury that this is what happened and the Court has absolutely no reason to doubt the truth of what she reports.

[3] Without explicitly admitting Plaintiff worked and lived in Australia, Plaintiff's counsel argued at the hearing that this document reflects an Australian address which should have put the CDCR on notice that Plaintiff worked as a nurse in Australia. However, review of the document, in fact, does not indicate this is Plaintiff's address. Indeed, there is no explanation on the document why this address is listed and no indication it is associated with Plaintiff except that it appears several lines below and to the right of his name. Coupled with other inexplicable information on the page near Plaintiff's name including, "Prospect Number," a bar code, other unexplained numbers, the significance of the Australian address is not obvious and the Court rejects that the failure to ask about this address at the deposition—in light of the questions that *were* asked—reflects a lack of due diligence.

4

documents and Plaintiff explained that, in fact, he did not pursue licensure in Canada after learning the revocation of his California license precluded it. Plaintiff argues implicitly that despite the fact he affirmatively and repeatedly denied working as a nurse outside of the country after being fired by the CDCR and denied having any other nursing job other than the Sutter Delta job, had the CDCR specifically inquired why he asked to have his educational status verified to organizations in Australia and Canada, he would have "come clean" and admitted his earlier falsehoods. The evidence of his sworn statements at his deposition belies this claim.

First, Plaintiff testified at his deposition that other than working for a two-month period ending in August 2009 for Sutter Delta in Antioch through a referral agency called Emerald, he had no other job. (Doc. 195-2 at 9-13) Plaintiff was asked, "You have not worked at all since August of 2009?" to which he responded, "No." Id. at 13. He was asked also, "Have you applied to any jobs outside the Bakersfield vicinity?" and he responded, "No." Id. at 15. He was asked, "Have you been licensed to work as an RN anywhere other than in any other states," to which he replied, "No." Id. Plaintiff was asked also whether he had "tried to get a nursing license in any other country," and he replied, "No." Id. at 18. Plaintiff was asked whether he received income from any source other than the Sutter Delta job since being fired and he indicated only that he had received some rental income and, "Unemployment."[4] (Doc. 195-2 at 22, 23) Plaintiff explained that he didn't feel he could hold a job due to his psychological condition and had been so prevented since 2010. Id. at 18-19. Plaintiff was asked where he had lived since moving to California in 2005 to which he replied, "Bakersfield." Id. at 20.

However, the CDCR's inquiry about other employment, including that in Canada, did not end there. Counsel inquired,

> Q. You ever apply for a job in Canada?
> A. No.
> Q. Did you apply for licensure in Canada?
> A. No.

---

[4] Plaintiff testified he received 90 weeks of unemployment which, it appears, means he received this public benefit while working in Australia and probably while working in Canada. (Doc. 195-2 at 22-23; Doc. 195-3 at 2, 8-9)

1  Q. **Did you ever ask Indiana State University to compete paperwork for you for licensure in Canada?**

3  A. Did I ask? Is that your question?

4  Q. Yes, it is.

5  A. Could you tell me again?

6  MS. AUSTIN: Could you please repeat my question.

7  (Record read.)

8  THE WITNESS: Yes, I did.

9  BY MS. AUSTIN:

10  Q. Okay. So when I asked earlier whether or not you had ever applied outside the country –

12  A. No. I asked them. I asked them to send my transcript.

13  Q. To whom?

14  A. To the Alberta State.

15  Q. To Alberta? The province of Alberta?

16  A. Yes.

17  Q. And why was that?

18  A. Huh?

19  Q. Why?

20  A. I took someone to get the license, but they said, "No, you can't."

21  Q. Indiana State University said they won't send your transcript to Alberta?

22  A. They said they can send, but then I came to know that, no, I can't.

23  Q. I'm sorry?

24  A. Then I came to know that I can't have the license.

25  Q. You couldn't have the license in Alberta?

26  A. Yes.

27  Q. Why?

28  A. Because I don't have license in here.

6

1  Q. Okay. Why was it you were seeking a license in Alberta?

2  A. Why I was seeking?

3  Q. Yes.

4  A. I was trying to utilize my degree that I could work in some states.

5  **Q. Have you ever applied for licensure anywhere else other than Alberta?**

6  **A. No.**

7  Q. Are you sure about that?

8  A. Yes.

9  **MR. ANDERSON: Let's not do that, Counsel. Okay? We don't need your commentary.**

10  **MS. AUSTIN: I'm just asking if he's certain.**

11  **MR. ANDERSON: You don't need to. He's under oath.**

12  **MS. AUSTIN:     Yes, he is.**

13  MR. ANDERSON:    We don't need your comments.

14  BY MR. [sic] AUSTIN:

15  **Q. Have you ever contemplated moving anywhere outside of California to obtain

16  either licensure or a job as a nurse?**

17  A. No.

18  Id. at 24-26, emphasis added.  This deposition occurred on September 17, 2012. (Doc. 195-2 at 4) The
19  fact that Plaintiff clarified that he asked for the records to be sent but then learned that, because he did
20  not have a nursing license "here," he could not get a license in Canada, explains why counsel stopped
21  this line of questioning.[5]  It is notable that counsel asked several times, broadly-worded, catch-all-type
22  questions designed to elicit any information about employment and licensure or residence elsewhere
23  and Plaintiff repeatedly denied this occurred.

24  _____

25  [5] Moreover, the logic behind Plaintiff's suggestion that the CDCR was put on notice of his employment in British
Columbia, given he testified he asked only for it to be sent to the province of Alberta and was, apparently, actually sent to
26  the provinces of Ontario and Prince Edward Island, is difficult to follow especially in light of his sworn testimony he was
not able to be licensed in Canada due to the loss of the California. nursing license.  The Court takes judicial notice
27  (according to Fed. R. Evid. 201(b)(1) and (2)) of the fact that Canada is made up of ten provinces, namely, Alberta,
Ontario, British Columbia, Prince Edward Island, Manitoba, Quebec, Nova Scotia, New Brunswick, New Foundland and
28  Labrador and Saskatchewan, and three territories, namely, the Northwest Territories, Nunavut and Yukon.  Notably, Prince
Edward Island is one of the easternmost provinces while British Columbia is the westernmost.

However, as reflected above, the CDCR asked whether Plaintiff "ever ask[ed] Indiana State University to compete paperwork for you for licensure in Canada?" and it was Plaintiff who reported he asked for the transcripts to be sent to Alberta.  Seemingly, Plaintiff argues that had the CDCR asked him why he had transcripts sent to these other provinces he would have *then* admitted to have been working in British Columbia; the argument is absurd.  Conspicuously missing is the magic language of a specific deposition question which Plaintiff contends would have caused him, finally, to provide a truthful response.

As if this was not enough, in response to interrogatories which specifically asked about all employers since 2000, Plaintiff reported only the Sutter Delta job after being fired by the CDCR.  (Doc. 195-2 at 33-35, 41)  Plaintiff clarified when referring to the Sutter Delta job, "**I took one other medical job** until my license was revoked as a result of defendants' unlawful conduct . . ." Id. at 41, emphasis added.  When asked in written interrogatories about any licenses he held in the previous 15 years, he listed no licenses after the one issued by California was revoked in 2010.  Id. at 35-36. These interrogatory responses were verified by Plaintiff on August 8, 2012 (Doc. 195-2 at 52) which was almost exactly 11 months after he began working at James Bay Centre. (Doc. 195-3 at 2)  Thus, the Court concludes the extent of the discovery conducted by the CDCR demonstrates due diligence in attempting to discover other employment.  This diligence failed only because Plaintiff was more adept at preventing the truth from being discovered than the CDCR was at eliciting it.

### b.     Resume

Second, the CDCR presents the resume provided by Plaintiff to James Bay Centre when he was applying for a job there.  (Doc. 195-3 at 5-10)  The resume is undated but, given the attachments thereto, it is apparent it was provided to James Bay Centre sometime in or after September 2011.  Id. at 195-3 at 6, 9. In this resume, Plaintiff reports he was currently employed at Werribee Mercy Hospital Hoppers Crossing in Australia and had been so employed since November 2010. Id. at 6. In addition, Plaintiff provided a letter from the Acting Nurse Unit Manager, Tianay Hyndman, from the Emergency Department of Werribee Mercy Hospital, dated May 10, 2011, which reports Plaintiff began working at the hospital on November 29, 2010 and his employment was continuing. Id. at 8. Hyndman reported also that Plaintiff worked 72 hours every two weeks.  Id. Attached to the resume

8

also was a letter from the HR Manager at Werribee Mercy Hospital, Loriene Christopher, who reported Plaintiff worked as an RN from November 29, 2010 through July 30, 2011 for a total of 1,388 hours. Id. at 9.  Finally, Plaintiff asserts in the resume that he is licensed by "CRNBC" and provides a license number which was "#0936850." Id. at 7.  Notably, this corresponds to the print-out provided by Ms. Carnes from the College of Registered Nurses of British Columbia as to license number 093685, which is associated with Ram Nehara. Id. at 15.

For the same reasons set forth above, the Court finds the resume to be newly discovered evidence which existed at the time of trial and was not discovered despite due diligence by the CDCR.

### c. Evidence of Insurability

Third, the CDCR presents a document entitled "Evidence of Insurability" which Plaintiff signed on June 13, 2012. (Doc. 195-3 at 12-13)  In the document, Plaintiff reports he lives at an address in Victoria, British Columbia in Canada. Id. at 12.  In addition, Plaintiff denies ever having applied for or received benefits for an injury or sickness, denies he had been absent from work for the past five years due to a medical reason, and denies he has ever had a psychiatric condition or mental which required medical consultation or hospitalization or treatment. Id.

For the same reasons set forth above, the Court finds the resume to be newly discovered evidence which existed at the time of trial and which was not discovered despite due diligence by the CDCR.

### d. College of Registered Nurses of British Columbia

Third, the CDCR provides a print-out related to Plaintiff's nursing license issued in British Columbia, Canada. (Doc. 195 at 15)  The print-out shows that on July 13, 2011, he was "inial[ly] regist[ered] with CRNBC." Id.

For the same reasons set forth above, the Court finds the resume to be newly discovered evidence which existed at the time of trial and was not discovered despite due diligence by the CDCR.

### e. The importance of the newly discovered evidence is of such magnitude that it would have impacted the outcome of the trial.

Having found the evidence to be "newly discovered," under Fed, R. Civ. P. 60(b)(2), the Court must determine whether its introduction would have impacted the trial result.  The Court concludes

that it would.

First, the Court's award of front pay was premised significantly upon the fact that Plaintiff demonstrated he was unable to find other nursing work. Indeed, when the Court inquired whether it should consider the fact Plaintiff maintained a nursing license in New Zealand, Plaintiff's counsel strongly opposed this idea and argued Plaintiff should not be required to work out of the country *despite that, clearly,* by that time he had been working in Australia and in Canada. The award of front pay without doubt would have been substantially lessened—or completely denied—had the Court known that Plaintiff had a demonstrated willingness to work outside of the United States.

Second, the Court's award of back pay would have been reduced by the amount of pay Plaintiff received while working in Australia and Canada. Given these periods covered November 29, 2010 through March 2013, Plaintiff would have been entitled only to back pay for the period of time from April 2009 through June 2009 and August 2009 through November 28, 2010—a substantially shorter period of time than that awarded.

Third, the evidence Plaintiff was able to work from November 29, 2010 through March 2013 and denied he ever had an emotional injury which impacted his ability to work, would have limited the award of damages for emotional injuries and would have likely eliminated any award for future emotional harm.

Finally, the impeaching value of this new evidence cannot be overstated in light of the fact that Plaintiff's case rested significantly upon his testimony. A great bulk of what Plaintiff testified occurred—including many of his statements that he engaged in protected activity—was uncorroborated. Thus, if this evidence was presented to the jury—in light of all of his previous statements under oath—it is probable the jury would have found his testimony to be incredible and would not have found he engaged in a protected activity.

Though Plaintiff asserts that evidence that is merely impeaching cannot support a finding that it is of such value as to have a probability of altering the jury's verdict, he has failed to cite to any valid Ninth Circuit case which so holds.[6] For example, Plaintiff relies upon <u>Feature Realty, Inc. v.</u>

---

[6] Plaintiff seems to take the position that *any* evidence which is impeaching, by the mere fact that it is impeachment, is insufficient to support the Rule 60(b)(2) motion. However, according the holdings in this Circuit, the issue is resolved by

City of Spokane, 331 F.3d 1082, 1093 (9th Cir. 2003).  However, Feature does not stand for this proposition and, in fact, in that case the Rule 60(b)(2) motion was denied based upon the fact the evidence was discovered before the entry of judgment. Id. A similar result occurred in Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 991 (9th Cir. 2001), also cited by Plaintiff.

Plaintiff cites to cases in other circuits which hold that "mere" impeaching evidence "generally" is insufficient to support a Rule 60(b)(2) motion, but in those cases the impeaching value was "mild" and lacking in the "damning" quality Rule 60(b)(2) envisions.  For example, in Thermacor Process, L.P. v. BASF Corp., 567 F.3d 736, 745, the newly discovered impeaching evidence related to a collateral issue and would not have impacted the outcome of the trial.  In Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 354 (8th Cir. 2009), the newly discovered evidence lacked "damning" character because it merely added to the contradictory testimony which *was* presented at trial. Id. Thus, in essence, these courts found the new evidence would not have impacted the outcome of the trial. That is a wildly different circumstance than the one here.

No person sitting through the trial in this case could call the evidence now presented in support of this motion as lacking in a damning character. Likewise, the suggestion that presenting this evidence would not have impeached Plaintiff to the point of impacting the outcome of the trial is unsupportable.  Therefore, the Court **GRANTS** the motion for new trial based upon Fed. R. Civ. P. 60(b)(2).

    ii**.**    **Rule 60(b)(3)**

A motion brought under Rule 60(b)(3) requires the moving party demonstrate by clear and convincing evidence, the verdict was obtained through fraud, misrepresentation or other misconduct and that it prevented the moving party from fully and fairly presenting its case. Bunch v. United States, 680 F.2d 1271, 1283 (9th Cir.1982).  "Although when the case involves the withholding of information called for by discovery, the party need not establish that the result in the case would be altered."   Jones v. Aero/Chem Corp., 921 F.2d 875, 879 (9th Cir. 1990).  However, under Rule

---

the Court's determination whether the new evidence is *material* to the outcome of the trial; the issue is not resolved by the Court's mere determination that the evidence is impeachment. See Jones v. Aero/Chem Corp., 921 F.2d at 878.  Evidence can be *both* material *and* impeaching. Thus, the Court declines to abandon the law of this Circuit in favor of the law as stated in others.

60(b)(3), the misconduct must have been material because such a motion "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." In re M/V Peacock, 809 F.2d 1403, 1405 (9th Cir.1987).   Finally, to prevail on the Rule 60(b)(3) motion, the moving party must demonstrate the misconduct was not discoverable with due diligence before or during the trial. Casey v. Albertson's Inc., 362 F.3d 1254, 1260 (9th Cir.2004)

Here, the CDCR has demonstrated that Plaintiff perpetrated his scheme to mislead the CDCR and the jury beginning with his responses to written discovery, continuing through his deposition testimony and ending with his trial testimony.  It is apparent Plaintiff intentionally chose this course and took all steps needed to prevent the CDCR, the Court and the jury from knowing the true facts of his circumstances.  By lying about where he lived, lying about the fact he worked at two additional nursing jobs after being fired by the CDCR, lying about not being able to work due to his emotional injury and by hiding the fact he reported to his Canadian employer that he had never suffered an emotional injury, he committed misconduct which attacked the integrity of the judicial process and undermined the orderly dispensation of justice.  In short, the Court has no hesitation in finding the misconduct prevented the CDCR from confronting Plaintiff at trial as to the true facts of this case and the true extent of his emotional injury.

Likewise, Plaintiff engaged his counsel—whether wittingly or not[7]—in the deception played on the Court.  The Court specifically inquired of counsel whether it should consider the fact Plaintiff maintained a nursing license in New Zealand when evaluating the front pay award.  Plaintiff's counsel strongly opposed this idea and urged that Plaintiff should not be required to separate from his family to obtain work outside the country.  Mr. Anderson stated,

> His family resides here in the United States. That would necessitate him leaving his family permanently . . . but his family resides here. And it would necessitate Mr. Nehara leaving his family because as they are right now, they are separated . . . And I don't think he should be required to uproot and move to New Zealand and/or require his family to do so because of what North Kern State Prison has done.

Mr. Anderson continued, "And I also believe, Your Honor, he testified that he did anything and everything to try and obtain work. And the *only work* he was able to obtain was working as a clerk."

---

[7] Plaintiff's counsel have failed to deny they were aware of Plaintiff's duplicity.

12

(Emphasis added)  In addition, counsel argued that due to Plaintiff's ongoing emotional deficit, his need to continue to take psychotropic medication precluded him from working as a nurse and, therefore, he should be awarded compensation until the usual age of retirement; eleven years hence. Clearly, these positions—the ability to work outside the country and the ability to work at all—were supported by the evidence presented by that time but now it appears these positions are flatly refuted by the evidence Plaintiff hid. Thus, the Court has little hesitation in finding Plaintiff engaged in a scheme to prevent the CDCR from fully and fairly presenting its case.

**ORDER**

Based upon the foregoing, the Court **ORDERS**:

1. Defendant's motion for new trial (Doc. 188) is **DENIED as MOOT**;
2. Plaintiff's motion for fees (Doc. 189) **DENIED as MOOT**;
3. Defendant's motion for new trial under Fed. R. Civ. P. 59, (Doc. 195) is **DENIED**;
4. Defendant's motion for relief from judgment under Fed. R. Civ. P. 60(b)(2) and (3) (Doc. 195) is **GRANTED**;
5. The order taxing costs (Doc. 194), issued June 25, 2013, is **VACATED**;
6. The Court sets a telephonic trial confirmation hearing on September 13, 2013 at 9:00 a.m.  CourtCall appearances are authorized.  No later than September 6, 2013, counsel **SHALL** file a joint statement setting forth whether the matter is ready to be set for a new trial and, if so, proposing dates for the trial.

IT IS SO ORDERED.

Dated:   **July 31, 2013**          **/s/ Jennifer L. Thurston**
                                    UNITED STATES MAGISTRATE JUDGE